IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| JEANNE MCCORMACK, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 7:18CV00457 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| BLUE RIDGE BEHAVIORAL HEALTHCARE, | ) | By: Hon. Glen E. Conrad |
| | ) | Senior United States District Judge |
| Defendant. | ) | |

Jeanne McCormack filed this action against her former employer, Blue Ridge Behavioral Healthcare ("Blue Ridge"), asserting claims under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601–2654, and the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101–12213. The case is presently before the court on Blue Ridge's motion for summary judgment. For the reasons set forth below, the motion will be granted with respect to McCormack's claims under the FMLA and her claims of discrimination and retaliation in violation of the ADA.[1]

**Factual Background**

The following facts are either undisputed or presented in the light most favorable to McCormack. See Tolan v. Cotton, 572 U.S. 650, 651 (2014) (emphasizing that courts must view the evidence on summary judgment in the light most favorable to the nonmoving party).

---

[1] McCormack's complaint also included a separate claim of failure to accommodate in violation of the ADA. In response to the motion for summary judgment, McCormack elected to abandon that claim. Therefore, it will be dismissed without further discussion.

## I.      Employment with Blue Ridge

In June of 2014, Blue Ridge hired McCormack to work as a case manager for adults with severe mental illnesses.   McCormack Dep. 8, ECF No. 28-1.[2]   In that position, McCormack worked with clients to form a support plan specific to each client's needs.   Id. at 9.   Her caseload ranged from 35 to 60 clients, and her assigned work hours were from 8:30 a.m. to 5:00 p.m.   Id. at 10–11, 13.

As a benefit of her employment, McCormack earned paid time off ("PTO") that covered sick days, vacation days, and holidays.   Id. at 13–14.   Employees with five years of service or less accrued a maximum of 4.5 hours of PTO per week.   Def.'s Reply Ex. 3, ECF No. 31-4.

## II.      Medical Issues

Approximately four months into her employment, McCormack began suffering from migraine headaches.   McCormack Dep. at 17.   The headaches prevented McCormack from walking straight and caused her to feel like she was having a stroke.   Id. at 18.   As a result, McCormack sought medical treatment and had to miss work.   Id. at 16.   She used PTO to cover the occasions on which she missed a complete day of work.   Id. at 19.   If she needed to leave work early, McCormack would sometimes "flex the time over the week, and either stay an hour longer or come in an hour earlier."   Id. at 23.

In August of 2015, McCormack was found to have tumors on her liver.   Pl.'s Ex. 2, ECF No. 28-2.   Although the associated pain affected McCormack's ability to work, the tumors did not require surgery or any time off from work.   McCormack Dep. 26–27.   Nor did they "require any sort of accommodation from Blue Ridge."   Id. at 27.

---

[2] ECF No. 28-1 is a complete transcript of McCormack's deposition.   Hereafter, all citations to her deposition will refer to this docket entry.

In April of 2016, McCormack was diagnosed with uterine fibroids.   Pl.'s Ex. 3, ECF No. 28-3.   The condition required inpatient surgery in August of 2016, followed by a six-week recovery period.   McCormack Dep. 27–28.   During that period, McCormack utilized PTO until it was exhausted and then "went on short-term disability" leave.   Id. at 24.   Written records from Blue Ridge indicate that McCormack requested FMLA leave beginning on August 15, 2016, and that she was issued a notice informing her that she was eligible for such leave.   Def.'s Reply Ex. 1 at 1, ECF No. 31-2.   After McCormack returned to work following the surgery, she applied for and was granted intermittent FMLA leave.   McCormack Dep. 25; Def.'s Reply Ex. 1 at 2.

In December of 2016, McCormack was diagnosed with a bacterial infection.   Pl.'s Ex. 4, ECF No. 28-4.   As a result of the infection, McCormack had to miss work.   McCormack Dep. 35.   She was once again approved for intermittent FMLA leave.   See Pl.'s Ex. 5 (FMLA certification form indicating that McCormack was "unable to work during flare-ups"); see also Def.'s Reply Ex. 1 at 3 (granting intermittent FMLA leave from December 1, 2016, to December 1, 2017).

### III.   Actions Taken after Requesting Leave

McCormack contends that Blue Ridge treated her differently after she requested time off for medical reasons.   The first example she provides relates to Blue Ridge's flextime policy.   During her period of employment, Blue Ridge had a written policy that allowed for adjustments to be made to an employee's daily schedule with the discretionary approval of an immediate supervisor.   See Pl.'s Ex. 6, ECF No. 28-6 ("Flextime scheduling must take into account the needs of the clients and requires approval of the immediate Supervisor.   Flextime scheduling is a privilege and not a right, and as such, employees must demonstrate the ability to work productively and remain in good standing with [Blue Ridge].").   McCormack occasionally utilized the flextime policy to "swap a day off during the week for working a day on the weekend."   McCormack Dep.

62.   However, after McCormack began taking FMLA leave, her flextime privileges were "taken away from [her]."   Id. at 45.   When McCormack "asked why that was the case," her supervisor, Shannon Horton, allegedly said, "You're being treated differently because you're on FMLA."   Id. (internal quotation marks omitted); see also id. at 62.   Horton also told McCormack that she needed to use her PTO more wisely.   Id. at 61; see also Horton Dep. 35, ECF No. 28-9 (indicating that McCormack "was asked not to use flextime anymore" after "it became excessive").

In February of 2017, Horton completed McCormack's annual performance review for 2016.   Pl.'s Ex. 10, ECF No. 28-10.   In each of twelve categories, Horton rated McCormack's performance as satisfactory or commendable.   Id. at 2–4.   Nonetheless, in the category of "Reliability and Cooperation," Horton noted that McCormack's "[a]ttendance" was "a concern" and that she had been "open to discussions with supervisor about planning PTO."   Id. at 4.

In March of 2017, McCormack met with Horton and Claude Henson, Blue Ridge's human resources manager, regarding the use of flextime for medical appointments.   McCormack Dep. 65–67.   During the meeting, Henson told McCormack that "she was being treated differently because she was on FMLA."   Henson Dep. 21, ECF No. 28-8.   At his deposition, Henson testified that he meant that McCormack "had job protection as a result of [the FMLA]."   Id. According to McCormack, however, she was told that the FMLA did not protect her and that she would be denied the use of flextime until she "manage[d her] time like an adult."   McCormack Dep. 63 (internal quotation marks omitted); see also id. at 94 (recalling Henson saying that she "need[ed] to use [her] PTO like an adult and manage [her] time like an adult").

It is undisputed that McCormack took time off for reasons unrelated to her medical issues. For instance, McCormack took off a week or more for a wedding.   McCormack Dep. 56, 107, ECF No. 28-1; Michelle Warren Dep. 24–25, ECF No. 27-4.   She also requested time off to go

4

snowboarding and after moving.   Warren Dep. 25; Pl.'s Ex. 11 at 11–12, ECF No. 28-11.   At times, Horton questioned whether McCormack had enough PTO to use.   McCormack Dep. 55. However, McCormack contends that she "never" took unpaid leave from work.   Pl.'s Br. Opp'n Summ. J. 12, ECF No. 28; see also McCormack Dep. 40 (answering "No" in response to being asked whether she ever took unpaid leave); id. at 55 ("I don't remember taking unpaid leave.").

In May of 2017, McCormack attended three meetings with Horton, Henson, and others, which she recorded without their knowledge.[3]   McCormack Dep. 88, 125–26.   During a meeting held on May 8, 2017, Henson reported that McCormack had complained of job-related stress, which "could potentially fall under the Americans with Disabilities Act as a disability."   Pl.'s Ex. 11 at 4.   In response to questions from Henson, McCormack indicated that stress was not affecting her ability to do her job and that she was still meeting the same goals from a statistical standpoint. Id. at 7.   Henson subsequently emphasized that "being on time really means being on time."   Id. When asked whether McCormack was late frequently enough to cause concern, another meeting participant indicated that McCormack was "pretty good at being on time" but used "a lot of last-minute PTO."   Id. at 8.   The meeting then focused on McCormack's use of leave for matters that were "not FMLA-related."   Id. at 11–12.   Henson emphasized that McCormack risked "going into leave without pay" and that she needed to bank time to use in the future.   Id. at 12–13. Another participant expressed the opinion that McCormack's "pattern of weekly time away from work" was "excessive."   Id. at 19.   Henson agreed that "[a]sking off at the last minute or missing . . . time . . . each and every week" was a problem and that McCormack "need[ed] to be considerate of that."   Id. at 20.

On May 15, 2017, McCormack met with Horton and Hartman Adams.   Pl.'s Ex. 12 at 2, ECF No. 28-12.   Horton began the meeting by noting that they were there to address a policy

---

[3] The audio recordings were transcribed.

violation and associated written warning, which stemmed from McCormack leaving a conference early on a Friday without telling anyone until the following Monday.   Id. at 3.   Horton reminded McCormack that she needed to immediately inform her supervisors of any changes to her work schedule.   Id.   In response, McCormack asserted that she left the conference early because of an emergency, and that she had "never done that" before.   Id.   McCormack signed the disciplinary warning "under protest" and expressed the belief that she was being treated differently than other employees who engaged in similar conduct.   Id. at 4–5.

During the third meeting in May of 2017, Henson indicated that the participants had gathered to discuss "how things work under FMLA, PTO, [and] leave without pay," as well as the fact that McCormack believed that she was being treated differently with respect to flextime. Pl.'s Ex. 13 at 3, ECF No. 28-13.   As for FMLA leave, Henson noted that McCormack should try to schedule medical appointments for times that would be more convenient for Blue Ridge, such as during lunchtime, after work, or on Saturdays.   Id. at 6.   With respect to PTO, Henson emphasized that employees "don't have any time off" once they use their PTO and that employees should not take leave without pay unless they have a "medical situation" or "medical appointments."   Id. at 8.   Henson further emphasized that those instances "should be minimal" and that employees should instead "accrue as much PTO [as possible] in anticipation of such incidents."   Id. at 9.   As for flextime, Henson acknowledged that McCormack's supervisors were treating her differently until she could demonstrate that she was willing to accrue PTO to cover absences for medical and non-medical reasons.   Id. at 11; see also id. ("So if you think you're being treated different on the flex time, the answer is, yes, you are being treated differently on the flex time.").

In addition to being denied flextime scheduling, McCormack testified that her "caseload increased" after she began taking FMLA leave and that she was required to "clock in . . . and clock out at the building," rather than doing so remotely by email or text.   McCormack Dep. 45. McCormack also testified that "[t]raining stopped" for her.   Id. at 46.   More specifically, McCormack testified that, "[a]t one point in time," she was told at the last minute that she would not be able to go to a training session that she had planned to attend.   Id. at 46–47.

### IV.   Promotion Denials

While working for Blue Ridge, McCormack unsuccessfully applied for four supervisory positions or promotions within the organization.   McCormack Dep. 73–78.   Two of the positions were clinician positions for which she applied "[t]owards the end of [her] time" working for Blue Ridge.   Id. at 80; see also Def.'s Br. Supp. Summ. J. 3, ECF No. 27 ("In 2016-2017, McCormack applied for two clinician positions . . . .").   During an interview for one of the clinician positions, a supervising nurse asked McCormack about her "attendance."   McCormack Dep. 80.

At some point thereafter, McCormack "was told that [Blue Ridge] decided to pull [the clinician positions] and change the qualifications."   Id. at 77.   In particular, Blue Ridge "changed the job description" to include a preference for candidates with a Qualified Mental Health Professional ("QMHP") certification.   Id. at 79.   According to evidence submitted by Blue Ridge, the organization changed the job description for the clinician positions based on regulatory changes applicable to Addiction Recovery Treatment Services ("ARTS").   See Warren Dep. 32, ECF No. 27-4 (explaining that posted clinician positions were "abolished and were replaced with therapist positions" based on "changes in the ARTS requirements"); Warren Decl. ¶ 3, ECF No. 32 (noting that attached documents "show the change in regulations that caused Blue Ridge Behavioral Healthcare to close a position that Ms. McCormack applied for because of [a] change

7

in regulation.").   At the time the position requirements were modified, McCormack was not yet

certified as a QMHP.   Id.   Consequently, she "was no longer qualified" for the positions.   Pl.'s

Br. Opp'n Summ. J. 15; see also Warren Decl. ¶ 3 ("Ms. McCormack did not qualify for the job

after the regulatory change.").

> **V.**      **Resignation**

On May 25, 2017, McCormack resigned via email, stating as follows:

> It has been made very clear to me that if I need time off of work for
> health reasons that I will be fired.   I have needed to take time off
> but have put it off to the detriment of my health because of the
> environment in which I work.   I do not wish to get fired as that
> could affect my future prospects down the road.   I need to take time
> off in June for health reasons and I know that I will be fired for this
> request or after I return.   It has been made abundantly clear that I
> cannot be accommodated and that medical leave is viewed as a
> significant detriment by leadership.   I have been punished for
> taking past leave and deterred from taking future leave.   My health
> is outside my control but [Blue Ridge] simply does not care.   I
> cannot work in this environment.   Please accept this as my
> resignation, effective immediately.

Pl's Ex. 15, ECF No. 28-15.   During her deposition, McCormack testified that she "felt like [she]

[was] left with no choice but to resign" because she believed that she was being "discriminated

against for taking leave."   McCormack Dep. 82.

## Procedural History

On September 14, 2018, McCormack filed this action against Blue Ridge.   In Count I of

her complaint, McCormack claims that Blue Ridge retaliated against her for taking FMLA leave.

In Count II, McCormack seeks to hold Blue Ridge liable for interference with FMLA rights.   In

Count III, McCormack asserts claims of discrimination and retaliation in violation of the ADA.

The case is presently before the court on Blue Ridge's motion for summary judgment.

The motion has been fully briefed and argued and is ripe for disposition.

## Standard of Review

An award of summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute is genuine if 'a reasonable jury could return a verdict for the nonmoving party.'" Libertarian Party of Va. v. Judd, 718 F.3d 308, 313 (4th Cir. 2013) (quoting Dulaney v. Packaging Corp. of Am., 673 F.3d 323, 330 (4th Cir. 2012)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

In considering a motion for summary judgment, the court must view the evidence in the light most favorable to the nonmoving party. Tolan, 572 U.S. at 651. To withstand a summary judgment motion, the nonmoving party must produce sufficient evidence from which a reasonable jury could return a verdict in her favor. Anderson, 477 U.S. at 248. "Conclusory or speculative allegations do not suffice, nor does a 'mere scintilla of evidence' in support of [the nonmoving party's] case." Thompson v. Potomac Elec. Power Co., 312 F.3d 645, 649 (4th Cir. 2002) (quoting Phillips v. CSX Transp., Inc., 190 F.3d 285, 287 (4th Cir. 1999)).

## Discussion

### I.     Claims under the FMLA

The FMLA provides eligible employees with certain rights and protections, including up "to a total of 12 workweeks of leave during any 12-month period . . . [b]ecause of a serious health condition" that renders the employee unable to perform her job. 29 U.S.C. § 2612(a)(1)(D). To be eligible for rights under the FMLA, an employee must work for her employer for at least twelve months. Id. § 2611(a)(2)(A)(i). "Generally, FMLA leave is unpaid leave," but an "employer may require the employee to substitute accrued paid leave for unpaid FMLA leave," meaning that

9

the paid leave "will run concurrently with the unpaid FMLA leave."   29 C.F.R. § 825.207.   After taking qualified FMLA leave, an employee is entitled to return to her pre-leave job or an equivalent position, and an employer may not eliminate any accrued employment benefit when an employee takes such leave.   29 U.S.C. § 2614(a)(1)(A)–(B); id. § 2614(a)(2).

In addition to these prescriptive rights and protections, the FMLA prohibits two kinds of conduct: (1) an employer cannot "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under [the FMLA]," 29 U.S.C. § 2615(a)(1); and (2) an employer cannot "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter," id. § 2615(a)(2).   "The first prohibition gives rise to 'interference' or 'entitlement' claims."   Fry v. Rand Constr. Corp., 964 F.3d 239, 244 (4th Cir. 2020) (internal quotation marks and citations omitted).   "The second prohibits retaliation or discrimination for opposing unlawful practices" or "for taking leave" under the FMLA.[4]   Id. at 244–45.   If an employer violates either prohibition, the FMLA provides a "restricted" cause of action: "The damages recoverable are strictly defined and measured by actual monetary losses . . . ."   Nevada Dep't of Human Res. v. Hibbs, 538 U.S. 721, 740 (2003) (citing 29 U.S.C. §§ 2617(a)(1)(A)(i)–(iii)).

In this case, McCormack asserts both types of claims: a claim for retaliation (Count I) and a claim for interference with FMLA rights (Count II).   The court will address each claim in turn.

---

[4] The United States Court of Appeals for the Fourth Circuit has held that claims of retaliation for taking FMLA leave arise under § 2615(a)(2), rather than § 2615(a)(1).   Fry, 964 F.3d at 245.   Although the Court recently questioned this approach in light of other appellate court decisions and regulations issued by the Department of Labor, it did not disturb it.   Id.   Accordingly, consistent with the parties' briefs, the court will consider McCormack's claim that she was retaliated against for taking FMLA leave as a claim arising under § 2615(a)(2).

A.      **Count I: Retaliation in violation of the FMLA**

McCormack first claims that Blue Ridge retaliated against her for taking FMLA leave. Such claims "are analogous to discrimination claims brought under Title VII." Laing v. Fed. Express Corp., 703 F.3d 713, 717 (4th Cir. 2013).   Accordingly, retaliation claims based on circumstantial evidence are evaluated under the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).   Id.   This framework, on which both parties rely, "requires the plaintiff first to establish a prima facie case of FMLA retaliation by proving three elements: '(1) [the plaintiff] engaged in protected activity; (2) her employer took an adverse action against her; and (3) there was a causal link between the two events.'"   Fry, 964 F.3d at 244–45 (alteration in original) (quoting Hannah P. v. Coats, 916 F.3d 327, 347 (4th Cir. 2019)).   If the plaintiff puts forth sufficient evidence to establish a prima facie case, "the burden shifts to the defendant to produce 'a legitimate, nonretaliatory reason for taking the employment action at issue.'"   Id. at 245 (quoting Hannah P., 916 F.3d at 347).   If the defendant does so, the burden shifts back to the plaintiff to "prove that the employer's explanation was false and a pretext for retaliation."   Id.

In this case, Blue Ridge does not dispute that McCormack engaged in protected activity by taking FMLA leave.   Blue Ridge instead challenges whether certain decisions or actions identified by McCormack qualify as adverse employment actions and whether she has presented sufficient evidence to establish that an adverse employment action was taken because she used FMLA leave.   In response, McCormack argues that she suffered two types of adverse employment actions in retaliation for taking FMLA leave: "constructive discharge" and denial of "multiple promotions."   Pl.'s Br. Opp'n Summ. J. 20, 22.

1.      **Constructive discharge**

An adverse employment action typically involves "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Hoyle v. Freightliner, LLC, 650 F.3d 321, 337 (4th Cir. 2011) (internal quotation marks and citation omitted). A resignation may constitute an adverse employment action if the resignation qualifies as a constructive discharge. Honor v. Booz-Allen & Hamilton, Inc., 383 F.3d 180, 186–87 (4th Cir. 2004); see also McKinley v. Salvation Army, 685 F. App'x 227, 228 (4th Cir. 2017) ("A constructive discharge can constitute an adverse employment action . . . .").

"To establish constructive discharge, an employee must meet a high standard." Ofochee v. Apogee Med. Grp., 815 F. App'x 690, 692 (4th Cir. 2020). In addition to actually resigning, the employee "must show that [her] 'working conditions became so intolerable that a reasonable person in the employee's position would have felt compelled to resign.'" Perkins v. Int'l Paper Co., 936 F.3d 196, 211 (4th Cir. 2019) (quoting Green v. Brennan, 136 S. Ct. 1769, 1776 (2016)). The requisite level of intolerability "is not established by showing merely that a reasonable person, confronted with the same choices as the employee, would have reviewed resignation as the wisest or best decision, or even that the employee subjectively felt compelled to resign." Id. at 212 (internal quotation marks and citations omitted). Rather, the employee must show that her working conditions were so intolerable that a reasonable person in her position "would have had no choice but to resign." Id. (internal quotation marks and citations omitted). "Unless conditions are beyond 'ordinary' discrimination, a complaining employee is expected to remain on the job while seeking redress." Evans v. Int'l Paper Co., 936 F.3d 183, 193 (4th Cir. 2019) (additional internal quotation marks and citations omitted); see also Groening v. Glen Lake Cmty.

Sch., 884 F.3d 626, 630 (6th Cir. 2018) ("The doctrine [of constructive discharge] does not protect employees who leave their job in apprehension that conditions may deteriorate later.  Instead, employees are expected to stay on the job if they can pursue other forms of relief.") (internal quotation marks and citations omitted).

In support of her constructive discharge claim, McCormack points to the following evidence in the record: (1) she lost flextime privileges and was told by her supervisor that the difference in treatment resulted from being on FMLA leave; (2) her caseload increased; (3) she was required to clock in and out of work from the office; (4) her performance evaluation for 2019 cited attendance concerns; (5) she received a disciplinary warning after leaving a conference early without permission; (6) she was denied the opportunity to attend a training session; and (7) she was not selected for promotions.  After reviewing existing caselaw, the court concludes that the evidence presented by McCormack does not meet the level of intolerability required to establish a constructive discharge claim.

The Fourth Circuit has made clear that "difficult or unpleasant working conditions and denial of management positions, without more, are not so intolerable as to compel a reasonable person to resign."  Perkins, 936 F.3d at 212.  For instance, in Jones v. UnitedHealth Grp., Inc., 802 F. App'x 780, 783–84 (4th Cir. 2020), the Court held that the plaintiff's placement on a corrective action process, the improperly strict application of a work-at-home policy, and the fact that white employees were allegedly treated differently with regard to the policy were "insufficient to avoid summary judgment."  Although the Court recognized that "preferential treatment of white employees would certainly be upsetting, unfair, and highly improper," the Court concluded that such conduct, without more, "cannot be the basis of a constructive discharge claim."  Id. at 784.  Similarly, In Alba v. Merrill Lynch & Co., 198 F. App'x 288, 294 (4th Cir. 2006), the Fourth

Circuit held that the working conditions described by the plaintiff, which included being unfairly criticized, threatened with a loss of benefits if he refused to retire, and disconnected from the company's computer system, while "difficult and stressful," could not "reasonably be described as intolerable."   In Williams v. Giant Food, Inc., 370 F.3d 423, 434 (4th Cir. 2004), the Court ruled that allegations of being yelled at, referred to as a poor manager, required to work with an injured back, and chastised in front of customers did "not establish the objectively intolerable working conditions necessary to prove a constructive discharge."   In Matvia v. Bald Head Island Mgmt., Inc., 259 F.3d 261, 273 (4th Cir. 2001), the Court held that "co-worker ostracism, denial of a management position, and the counseling received for turning in an inaccurate time card would not have compelled the reasonable person to resign."   And in Carter v. Ball, 33 F.3d 450, 459–460 (4th Cir. 1994), the Court held that being unfairly criticized, losing supervisory responsibilities, and having one's supervisor display a poster that may have been offensive to African Americans was insufficient to establish constructive discharge.

Similarly, in the context of the FMLA, courts have held that "an employer's criticism of an employee does not amount to constructive discharge," even when the criticism is "directed at [the employee's] use of FMLA leave."   Groening, 884 F.3d at 631; see also Tanganelli v. Talbots, Inc., 169 F. App'x 123, 125–27 (3d Cir. 2006) (holding that there was "nothing approaching intolerability" where, upon returning from FMLA leave, an employee was criticized for taking time off, had job responsibilities taken away, was not given keys to the store that she assisted in managing, and was not invited to attend a management meeting) (internal quotation marks omitted); Weigold v. ABC Appliance Co., 105 F. App'x 702, 708–09 (6th Cir. 2004) (holding that rude and inappropriate comments related to the plaintiff's exercise of FMLA-protected rights fell short of the severe conditions necessary to suggest a constructive discharge).

Against this backdrop, the court concludes that the evidence offered by McCormack is insufficient to withstand summary judgment on the theory of constructive discharge.   In short, the actions, decisions, and conversations cited by McCormack do not rise to the level of intolerability required by existing caselaw.   While McCormack may have subjectively believed that she needed to resign, she has not shown that her working conditions were "beyond ordinary discrimination" and so intolerable that a reasonable person "would have had no choice but to resign."   Evans, 936 F.3d at 193 (internal quotation marks and citations omitted).   Accordingly, McCormack's resignation does not constitute an adverse employment action and is therefore not actionable under the FMLA.

### 2.    Failure to promote

McCormack also claims that she was denied promotions in retaliation for taking FMLA leave.   It is undisputed that failure to promote constitutes an adverse employment action.   See Whitaker v. Nash Cnty., 504 F. App'x 237, 239 (4th Cir. 2013) ("The district court properly found that Whitaker suffered two adverse employment actions: failure to promote and termination.") (citing James v. Booz-Allen & Hamilton, Inc., 368 F.3d 371, 375 (4th Cir. 2004)).   To make out a prima facie case of FMLA retaliation based on a failure to promote, McCormack must present sufficient evidence to establish a causal connection between her FMLA leave and the adverse employment decision.

During her deposition, McCormack testified that she applied for a total of four other positions with Blue Ridge.   McCormack Dep. 73.   However, with the exception of the two clinician positions for which she applied "[t]owards the end of [her] time working there," id. at 80, McCormack has provided no indication as to when she applied for the other positions. McCormack obviously "cannot claim retaliation based on acts that occurred prior to [her]

request[s] for FMLA leave." Mitchell v. Pilgrim's Pride Corp., 817 F. App'x 701, 712 (11th Cir. 2020). Accordingly, aside from the clinician positions, McCormack has failed to establish a causal link between her leave requests and the adverse hiring decisions.

With respect to the clinician positions, McCormack's deposition testimony indicates that she applied for the positions within months of taking FMLA leave and that she was asked about her job attendance during an interview. In keeping with existing precedent, the court finds this evidence sufficient to satisfy the "less onerous" burden of establishing causation at the prima facie stage. See Yashenko v. Harrah's NC Casino Co., 446 F.3d 541, 551 (4th Cir. 2006) (holding that the plaintiff made a prima facie showing of retaliation based on the temporal proximity between his FMLA leave and termination) (internal quotation marks and citation omitted); Waag v. Sotera Def. Sols., Inc., 857 F.3d 179, 192 (4th Cir. 2017) (agreeing that, for purposes of establishing a prima facie case of retaliation for exercising FMLA rights, "close temporal proximity between activity protected by the statute and an adverse employment action may suffice to demonstrate causation").

Under the McDonnell Douglas framework, the burden shifts to Blue Ridge to produce evidence of a legitimate, nondiscriminatory reason for not selecting McCormack for the clinician positions. Blue Ridge has met this burden by producing evidence that the posted clinician positions were withdrawn in response to regulatory changes and replaced with therapist positions for which different credentials were required. In particular, the therapist positions required certification as a QMHP, which McCormack admittedly "had not obtained at that time." Pl.'s Br. Opp'n Summ. J. 15.

The burden therefore shifts back to McCormack to show that the asserted justification for her non-selection was pretextual. Fry, 964 F.3d at 245; Waag, 857 F.3d at 192. To establish

pretext, a plaintiff must do more than present conclusory or speculative allegations of discrimination or retaliation. Causey v. Balog, 162 F.3d 795, 801 (4th Cir. 1998). She must present enough evidence that would permit a reasonable jury to find that the proffered explanation "was false and merely a pretext for FMLA retaliation." Fry, 964 F.3d at 247.

In response to the pending motion, McCormack summarily asserts that an individual selected for one of the therapist positions, Emily Kieler, "also did not have a QMHP certification." Pl.'s Br. Opp'n Summ. J. 15. However, the record belies this assertion. Blue Ridge has submitted evidence confirming that Kieler obtained her QMHP certification in June of 2016, before she was selected for the position. See Def.'s Reply Br. Ex. 2, ECF No. 31-3 Moreover, McCormack has presented no evidence to support the assertion that the position requirements were changed for the purpose of removing her from the selection pool. Thus, McCormack's efforts to connect her FMLA leave with Blue Ridge's subsequent hiring decisions do not rise above mere speculation, and she accordingly fails to establish pretext. See Sharif v. United Airlines, Inc., 841 F.3d 199, 204 (4th Cir. 2016) ("[Plaintiff] cannot rely upon 'mere speculation or the building of one inference upon another' to establish that [an adverse employment decision was made] in retaliation for taking FMLA leave.") (quoting Othentec Ltd. v. Phelan, 526 F.3d 135, 140 (4th Cir. 2008)). Accordingly, Blue Ridge is entitled to summary judgment on the claim of retaliatory failure to promote.

### 3.    Other discrete actions

In her brief in opposition to the pending motion, McCormack does not specifically argue that any other discrete action, such as the suspension of flextime privileges, is independently actionable under the FMLA. Nonetheless, to the extent that her brief could be read to present such argument, the court concludes that Blue Ridge is entitled to summary judgment.

The court begins by noting that "[m]any courts" in the Fourth Circuit "have held that an employer's refusal to allow a flex schedule does not qualify as an adverse employment action."[5] Shivers v. Saul, No. 1:19-cv-02434, 2020 U.S. Dist. LEXIS 226453, at *10 (D. Md. Dec. 2, 2020) (collecting cases in the Fourth Circuit); see also Parsons v. Wynne, 221 F. App'x 197, 198–99 (4th Cir. 2007) (holding that the plaintiff's removal from an alternate work schedule was not a materially adverse action for purposes of a retaliation claim); Dailey v. Lew, No. 1:15-cv-02527, 2016 U.S. Dist. LEXIS 51532, at *21 (D. Md. Apr. 18, 2016) (holding that the suspension and denial of teleworking privileges did not constitute adverse employment actions), aff'd, 670 F. App'x 142 (4th Cir. 2016).   Likewise, the Fourth Circuit has held that poor performance reviews, written reprimands, and changes to an employee's workload do not constitute adverse employment actions in the absence of some detrimental effect.   See Dortch v. Cellco P'ship, 770 F. App'x 643, 647 (4th Cir. 2019) (poor performance evaluations); Adams v. Anne Arundel Cnty. Pub. Sch., 789 F.3d 422, 429 (4th Cir. 2015) (reprimands); James, 368 F.3d at 376 (new job assignments).   The same is true for the denial of training opportunities.   See Jensen-Graf v. Chesapeake Employers' Ins. Co., 616 F. App'x 596, 598 (4th Cir. 2015) (affirming the dismissal of a retaliation claim where the plaintiff pled no facts showing how she was tangibly harmed by the denial of a professional development course).

Additionally, and perhaps more importantly, McCormack has not shown that she suffered any actual monetary losses as a result of these discrete actions or that she has any viable claim for equitable relief arising therefrom.   See Hibbs, 538 U.S. at 740 (emphasizing that recoverable damages under the FMLA are "strictly defined and measured by actual monetary losses").

---

[5] In the specific context of the FMLA, at least one court has found the denial of flextime "entirely reasonable" in light of an employer's need to track an employee's time, ensure compliance with the FMLA, and limit its own liability under the Act.   Ranade v. BT Americas, Inc., No. 1:12-cv-01039, 2013 U.S. Dist. LEXIS 155183, at *8 (E.D. Va. Oct. 28, 2013), aff'd, 581 F. App'x 182 (4th Cir. 2014).

Consequently, McCormack "has no grounds for relief" under the FMLA and Blue Ridge is therefore "entitled to judgment as a matter of law." Walker v. United Parcel Serv., Inc., 240 F.3d 1268, 1278 (10th Cir. 2001); see also Montgomery v. Maryland, 72 F. App'x 17, 20 (4th Cir. 2003) (concluding that the plaintiff's FMLA claim was properly dismissed under Rule 12(b)(6) since the plaintiff did not allege that she suffered any actual monetary damages and her demand for judgment did not seek relief that was recoverable under the FMLA); Williams v. Toyota Mfg., Ky., Inc., 224 F.3d 840, 844–45 (6th Cir. 2000) (finding summary judgment for the defendant appropriate where the plaintiff offered no evidence of any economic damages resulting from the alleged violation of the FMLA).

For all of these reasons, the court concludes that Blue Ridge is entitled to summary judgment on McCormack's claim of retaliation in violation of the FMLA.

**B.    Count II: Interference with FMLA rights**

McCormack next claims that Blue Ridge interfered with her FMLA rights. "To make out an 'interference' claim under the FMLA, an employee must . . . demonstrate that (1) [she] is entitled an FMLA benefit; (2) [her] employer interfered with the provision of that benefit; and (3) that interference caused harm." Adams, 789 F.3d at 427 (citing Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81, 89 (2002)). For purposes of the second element, interference includes "not only refusing to authorize FMLA leave, but discouraging an employee from using such leave." 29 C.F.R. § 825.220(b). To satisfy the third element, an employee must prove "that the violation prejudiced her in some way." Ranade v. BT Americas, Inc., 581 F. App'x 182, 184 (4th Cir. 2014) (citing Ragsdale, 535 U.S. at 89). "Such prejudice can be proven by showing that she lost compensation or benefits 'by reason of the violation,' 29 U.S.C. § 2617(a)(1)(A)(i)(I); sustained other monetary losses 'as a direct result of the violation,' id. § 2617(a)(1)(A)(i)(II); or

suffered some loss in employment status remediable through 'appropriate' equitable relief, such as employment, reinstatement, or promotion, id. § 2617(a)(1)(B)."   Id.; see also Anderson v. Discovery Communs., LLC, 517 F. App'x 190, 198 (4th Cir. 2013) (same).

For purposes of the pending motion, the court will assume that a reasonable jury could find that various comments regarding McCormack's use of leave could have discouraged her from requesting additional leave under the FMLA.[6]   Nonetheless, the FMLA "provides no relief unless the employee has been prejudiced by the violation." Ragsdale, 535 U.S. at 89.   For the following reasons, the court concludes that the interference claim fails for lack of prejudice.

First, the record reveals that Blue Ridge approved McCormack's requests for FMLA leave, including the request for intermittent leave submitted four months before she resigned.   And as was true in Adams, McCormack has not suggested that Blue Ridge denied her any FMLA leave that she requested.   See Adams, 789 F.3d at 427 (describing this as a "salient fact" for purposes of the plaintiff's interference claim); see also Munoz v. Selig Enters., Inc., 981 F.3d 1265, 1275 (11th Cir. 2020) (holding that the plaintiff did not suffer any harm from the alleged interference since she was not denied FMLA leave); Downs v. Winchester Med. Ctr., 21 F. Supp. 3d 615, 619 (W.D. Va. 2014) (Urbanski, J.) (concluding that because the plaintiff "failed to allege that she was actually denied any FMLA benefits," the plaintiff "failed to allege any prejudice related to FMLA interference").   To the contrary, McCormack acknowledged at her deposition that Blue Ridge did not prevent her from taking FMLA leave.   See McCormack Dep. 44, 84.

---

[6]  Blue Ridge correctly notes, however, that certain statements made by Henson, such as those suggesting that McCormack should try to schedule medical appointments for more convenient times, were not inconsistent with FMLA regulations.   See 29 C.F.R. § 825.203 ("If an employee needs leave intermittently or on a reduced leave schedule for planned medical treatment, then the employee must make a reasonable effort to schedule the treatment so as not to disrupt unduly the employer's operations.").

Additionally, McCormack has not presented any evidence indicating that she lost compensation or suffered any other form of monetary loss as a result of the alleged interference with her FMLA rights.  See, e.g., Anderson, 517 F. App'x at 198 (holding that the plaintiff's interference claim failed where the only injury alleged was that the plaintiff was not permitted to work a reduced schedule).  Rather than requesting or taking additional leave under the FMLA, McCormack chose to resign from Blue Ridge.  To the extent McCormack claims that she was forced to do so, she has not presented evidence from which a rational jury could find that her working conditions were so intolerable that a reasonable employee would have felt compelled to resign.  See Festerman v. Cnty. of Wayne, 611 F. App'x 310, 318–19 (6th Cir. 2015) (recognizing that constructive discharge can satisfy the prejudice prong of an FMLA interference claim provided that the plaintiff offers sufficient evidence to establish the requisite elements).  Accordingly, McCormack's resignation does not satisfy the prejudice requirement.  See Xula v. Chase Bank, J.P. Morgan Chase, No. 1:15-cv-04752, 2019 U.S. Dist. LEXIS 192710, at *33–34 (N.D. Ill. Nov. 6, 2019) (holding that a plaintiff who voluntarily resigned from his position could not recover for FMLA interference where there was no showing of constructive discharge or other actionable prejudice).

In the absence of any evidence of prejudice arising from the alleged interference with her FMLA rights, McCormack's claim "necessarily fails."  Waggel v. George Wash. Univ., 957 F.3d 1364, 1377 (D.C. Cir. 2020).  Thus, Blue Ridge is entitled to summary judgment on the FMLA interference claim.

### III.    Claims under the ADA

McCormack also seeks relief under the ADA.   In Count III of her complaint, McCormack claims that Blue Ridge engaged in disability discrimination and retaliation.

### A.    Disability discrimination

The ADA prohibits discrimination "against a qualified individual on the basis of disability in regard to . . . the hiring, advancement, or discharge of employees, . . . and other terms, conditions, and privileges of employment."   42 U.S.C. § 12112(a).   When a plaintiff alleges that her employer unlawfully discriminated against her in violation of the ADA, she may proceed under the burden-shifting framework established in McDonnell Douglas.   Laird v. Fairfax Cty., 978 F.3d 887, 892–93 (4th Cir. 2020).   Under this framework, the plaintiff is initially required to show "(1) that she has a disability, (2) that she is a 'qualified individual' for the employment in question, and (3) that her employer discharged her (or took other adverse employment action) because of her disability."   Jacobs v. N.C. Admin. Office of the Courts, 780 F.3d 562, 581 (4th Cir. 2015) (brackets and internal quotation marks omitted).

In this case, Blue Ridge does not challenge whether McCormack qualified as disabled under the ADA.[7]   Instead, Blue Ridge contends that McCormack is unable to prove that it took any adverse employment action against her because of her disability.[8]   In response, McCormack maintains that "she was denied multiple promotions and constructively discharged" in violation of the ADA.   Pl's Br. Opp'n Summ. J. 22.   For many of the same reasons set forth above, the court concludes that Blue Ridge is entitled to summary judgment.

---

[7] For purposes of the ADA, a person is disabled if she has "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) [is] regarded as having such an impairment."   42 U.S.C. § 12102(1).

[8] As the Fourth Circuit recently explained, "[w]hat qualifies as an 'adverse action' [for purposes of the ADA] differs slightly depending on whether the claim is for unlawful discrimination or retaliation."   Laird, 978 F.3d at 893.   "For a discrimination claim, the plaintiff must show that her employer took an action that adversely 'affect[ed] employment or alter[ed] the conditions of the workplace.'"   Id. (alterations in original) (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 62 (2006)).   For a retaliation claim, the plaintiff must show that her employer took a "materially adverse" action, "meaning that the plaintiff must show that the action 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"   Id. (quoting White, 548 U.S. at 68).   Despite the difference in scope, "both claims share a 'common element': an adverse action, meaning some action that results in some 'significant detriment' to the employee."   Id. (quoting Adams, 79 F.3d at 431).

It is undisputed that constructive discharge "may constitute an adverse employment action" for purposes of the ADA.  <u>Lacasse v. Didlake, Inc.</u>, 712 F. App'x 231, 239 (4th Cir. 2018).   Nonetheless, McCormack has not submitted evidence that would allow a reasonable jury to find that a constructive discharge occurred in this case.   Accordingly, her disability discrimination claim based on a constructive discharge theory cannot survive summary judgment.

To the extent McCormack claims that she was passed over for supervisory positions or promotions on the basis of disability discrimination, McCormack has arguably made the requisite prima facie showing of discrimination only with respect to the clinician positions for which she was questioned about her attendance issues during an interview.[9]   For the reasons set forth above, however, Blue Ridge has offered a legitimate, nondiscriminatory reason for not selecting McCormack for the clinician positions—namely, that the positions were modified in response to regulatory changes and McCormack did not meet all of the modified requirements.   As was true with her FMLA retaliation claim, McCormack has not shown that the proffered reason was pretext for disability discrimination.   Accordingly, Blue Ridge is entitled to summary judgment on the discrimination claim asserted in Count III.

### B.   <u>Retaliation</u>

The ADA also prohibits employers from retaliating against an employee for engaging in statutorily protected activity.  <u>See</u> 42 U.S.C. § 12203.   "To establish a prima facie retaliation claim under the ADA, a plaintiff must prove (1) [she] engaged in protected conduct, (2) [she] suffered an adverse action, and (3) a causal link exists between the protected conduct and the adverse action."  <u>Reynolds v. Am. Nat'l Red Cross</u>, 701 F.3d 143, 154 (4th Cir. 2012).

---

[9] As previously noted, McCormack has provided no indication as to when she applied for the other positions and has otherwise failed to present sufficient evidence from which a reasonable jury could find that she was not selected for the other positions on the basis of disability discrimination.

In seeking summary judgment on this claim, Blue Ridge persuasively argues that the claim fails at the first element—that McCormack engaged in protected conduct.   For purposes of the ADA, protected activity includes "oppos[ing] any act or practice made unlawful by [the ADA]," 42 U.S.C. § 12203(a), and "requesting an accommodation" for a disability, Jacobs, 780 F.3d at 577.   See also Preddie v. Bartholomew Consol. Sch. Corp., 799 F.3d 806, 814–815 (7th Cir. 2015) ("[Plaintiff] must have engaged in a statutorily protected activity—in other words, [she] must have asserted [her] rights under the ADA by either seeking an accommodation or raising a claim of discrimination due to [her] disability.").

In her brief in opposition, McCormack does not contend that she complained of disability discrimination or requested an accommodation under the ADA.   Instead, McCormack solely claims to have "engaged in protected activity" by "taking FMLA leave."   Pl.'s Br. Opp'n Summ. J. 20 (emphasis added).   Notably absent, however, is any assertion that her requests for FMLA leave also qualified as requests for an ADA accommodation, much less any citation to authority supporting such assertion.   And the court's own review of existing caselaw supports the opposite conclusion.   See, e.g., Waggel, 957 F.3d at 1373 ("reject[ing the plaintiff's] argument that her requests for FMLA leave should have been construed as requests for an ADA accommodation"); Acker v. Gen. Motors, LLC, 853 F.3d 784, 791–92 (5th Cir. 2017) (explaining "why requesting FMLA leave alone is not a request for an ADA reasonable accommodation"—namely, "an employee seeking FMLA leave is by nature arguing that he cannot perform the functions of the job, while an employee requesting a reasonable accommodation communicates that he can perform the essential functions of the job"); Preddie, 799 F.3d at 815 (holding that the plaintiff's periodic requests for medical leave, without more, did "not qualify as 'protected activity' under the ADA"); Sowers v. Bassett Furniture Indus., Inc., No. 4:19-cv-00039, 2021 U.S. Dist. LEXIS

15395, at *20 n.7 (W.D. Va. Jan. 27, 2021) (Cullen, J.) (noting that "requesting FMLA leave is not a protected activity under the ADA"); but see Capps v. Mondelez Global, LLC, 847 F.3d 144, 156–57 (3d Cir. 2017) (recognizing that "a request for FMLA leave may qualify, under certain circumstances, as a request for reasonable accommodation under the ADA," and assuming without deciding that the plaintiff's request for intermittent FMLA leave also constituted a request for a reasonable accommodation under the ADA) (emphasis added) (citing 29 C.F.R. § 825.702(c)(2)).

Nonetheless, even if McCormack could be said to have engaged in an ADA-protected activity by requesting FMLA leave, her ADA retaliation claim fails for the reasons set forth above. In short, there is insufficient evidence to survive summary judgment on a theory of constructive discharge or failure to promote, and McCormack does not identify any other adverse action for which she is entitled to relief under the ADA. See Pl.'s Br. Opp'n Summ. J. 20 (identifying "constructive discharge" as the retaliatory action allegedly taken against her); id. at 22 (asserting that she was "denied multiple promotions and constructively discharged" in violation of the ADA). Accordingly, Blue Ridge is entitled to summary judgment on the retaliation claim asserted in Count III.

## Conclusion

For the reasons stated, Blue Ridge's motion for summary judgment will be granted with respect to McCormack's claims of retaliation and interference under the FMLA and her claims of discrimination and retaliation in violation of the ADA.

The Clerk is directed to send a copy of this memorandum opinion to all counsel of record.

DATED: This   3rd   day of March, 2021.

_____

Senior United States District Judge